UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD GERLACH, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:09-CV-1950 (JCH) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF DANBURY, et al., | : | MARCH 27, 2012 |
| Defendants. | : | |

**RULING RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 89)**

**I.     INTRODUCTION**

Plaintiff, Richard Gerlach, brings this case against the City of Danbury and the

Board of Directors of the 1967 Firefighters Pension Fund of Danbury (hereafter

"Pension Board" or the "Board").[1]  In his remaining claims, Gerlach alleges that the

defendants violated Gerlach's procedural due process rights by wrongfully depriving him

of a service connected disability pension, in violation of 42 U.S.C. § 1983.  In addition,

Gerlach alleges that the City of Danbury breached the Collective Bargaining Agreement

(hereafter "CBA").[2]  Defendants filed a Motion for Summary Judgment as to all of

Gerlach's remaining claims.[3]

---

[1] Gerlach originally brought suit against several individuals in their official and individual capacities as well.  See Amd. Compl.  These claims were previously dismissed, along with Counts Two and Three of Gerlach's Amended Complaint.  See Doc. Nos. 82, 110.

[2] Gerlach originally claimed breach of "the statutes, Charter, City Ordinances and the Collective Bargaining Agreement."  The court's previous Ruling (Dorsey, J.) narrowed this claim to arise solely with respect to the CBA.  See Doc. No. 82.

[3] On March 15, 2012, nearly nine months after they originally filed this Motion, and two months after the Motion was joined, defendants filed a Supplemental Memorandum in Support of their Motion, raising for the first time the issue of whether the Pension Board may be sued.  Doc. No. 130.  As the court grants summary judgment on other grounds, the court will not address whether the Pension Board was a proper defendant in this case.  However, the court notes that, for the purposes of this Ruling, it has considered all filings by the parties.

1

## II.   STATEMENT OF FACTS

Gerlach began working as a firefighter in Danbury in August 1983, and was promoted to dispatcher in August 2005.  L.R. 56(a)(1) Stmt. ¶ 40; L.R. 56(a)(2) Stmt. ¶ 40.  Gerlach experienced symptoms of depression throughout his thirties and forties, while working at the Danbury Fire Department (hereafter "DFD").  See L.R. 56(a)(2) Stmt. ¶ 41.  In early 2007, Gerlach's depressive symptoms increased.  See L.R. 56(a)(1) Stmt. ¶ 44.[4]  On March 7, 2007, Gerlach took leave from work to seek treatment for his depression.  See L.R. 56(a)(1) Stmt. ¶ 45; L.R. 56(a)(2) Stmt. ¶ 45. The parties dispute whether this leave qualified as a leave of absence or sick leave; however, it is undisputed that Gerlach returned to work on March 30, 2007 and worked as a dispatcher through October 2007.  See L.R. 56(a)(1) Stmt. ¶¶ 45–47; L.R. 56(a)(2) Stmt. ¶¶ 45–47.

On October 13, 2007, Gerlach called in sick and notified Captain Gary Arconti that he would be out of work for his three day shift.  See L.R. 56(a)(2) Stmt. ¶ 48.  On October 17, 2007, Gerlach informed Arconti that he would be out of work indefinitely. See id. at ¶ 49.  Arconti reported both of these conversations to Fire Chief Geoffrey Herald.  See L.R. 56(a)(1) Stmt. ¶ 50; L.R. 56(a)(2) Stmt. ¶ 50.

On October 23, 2007, Gerlach's social worker, Jane Freeman, notified Herald that Gerlach was "unable to work in any capacity indefinitely."  See L.R. 56(a)(2) Stmt. ¶ 51; Defs.' Ex. 17.  The parties dispute whether this constituted a request for a leave of

---

[4] Gerlach denies this fact in his Local Rule 56(a)(2) Statement; however, he does not cite to admissible evidence to support his denial.  In accordance with L.R. 56(a)(3), where a party fails to provide a specific citation to admissible evidence in the record, the court may deem such facts to be admitted. Where the defendants' asserted fact is supported by evidence in the record and Gerlach has failed to provide citations to admissible evidence in support of his denial of the fact, the court will deem the fact to be admitted.  Further, where Gerlach has admitted a fact "with clarification" and the "clarification" goes beyond the scope of the original fact, the court will deem such fact to be admitted.

absence; however, it is undisputed that Freeman did not provide a return to work date for Gerlach.  See L.R. 56(a)(1) Stmt. ¶¶ 51–52; L.R. 56(a)(2) Stmt. ¶¶ 51–52.  On or about October 23, 2007, Gerlach was placed on sick leave pursuant to Article 14 of the CBA.  See L.R. 56(a)(1) Stmt. ¶ 53; L.R. 56(a)(2) Stmt. ¶ 53.[5]  Though the parties dispute whether he was required to do so, it is undisputed that Gerlach never requested injury leave pursuant to Article 15 of the CBA or filed a workers' compensation claim.  See L.R. 56(a)(1) Stmt. ¶ 53; L.R. 56(a)(2) Stmt. ¶ 53.

On several occasions, Herald communicated with Gerlach that, pursuant to Article 14, Freeman must provide Herald with a return to work date in order for Gerlach to remain on a paid leave of absence; however, Freeman did not provide such a date.  See L.R. 56(a)(1) Stmt. ¶¶ 54–55; L.R. 56(a)(2) Stmt. ¶¶ 54–55.[6]  In addition, Gerlach was sent paperwork related to the Family and Medical Leave Act, requesting that he provide a Certification of Health Care Provider; however, Gerlach did not return the paperwork.  See L.R. 56(a)(1) Stmt.  ¶ 56; L.R. 56(a)(2) Stmt. ¶ 56.

On February 13, 2008, Herald wrote to Gerlach, stating that Herald was invoking the independent medical exam (hereafter "IME") provisions of Article 14 of the CBA due to Gerlach's failure to provide a return to work date and failure to submit the Certification of Health Care Provide form.  See L.R. 56(a)(1) Stmt. ¶ 57; L.R. 56(a)(2) Stmt. ¶ 57.[7]  Defendants assert that the Pension Board designates Corporate Health Care of Danbury (hereafter "CHC") to determine which doctors should perform the IMEs; however, Gerlach asserts that, in his case, this process was influenced by others' input.

---

[5] See supra n. 3.

[6] See supra n. 3.

[7] See supra n. 3.

See L.R. 56(a)(1) Stmt. ¶ 32; L.R. 56(a)(2) Stmt. ¶ 32. It is undisputed however, that Dr. Thomas Landino, Ph.D., evaluated Gerlach on more than one occasion and determined that Gerlach should not return to work as a dispatcher. See L.R. 56(a)(1) Stmt. ¶ 62; L.R. 56(a)(2) Stmt. ¶ 62. In addition, it is undisputed that neither Gerlach nor the Union filed a grievance regarding Herald's decision to send Gerlach to an IME. See L.R. 56(a)(1) Stmt. ¶ 58; L.R. 56(a)(2) Stmt. ¶ 58.

On April 7, 2008, Herald wrote to Gerlach, informing him that, based on Landino's report, termination was being considered because he could no longer perform the essential functions of his job, and that a hearing would be held on April 17, 2008 to discuss the matter. See L.R. 56(a)(1) Stmt. ¶ 63; L.R. 56(a)(2) Stmt. ¶ 63. At the meeting, Gerlach was represented by the Union President. L.R. 56(a)(1) Stmt. ¶ 64; L.R. 56(a)(2) Stmt. ¶ 64. The parties agree that, at this meeting, Gerlach agreed to apply for a disability pension by May 2, 2008 in lieu of having his employment terminated and to comply fully with the pension process; however, Gerlach asserts that his agreement was not voluntary. See L.R. 56(a)(1) Stmt. ¶ 65; L.R. 56(a)(2) Stmt. ¶ 65. Gerlach was told that his pay would continue so long as his pension application was pending and he was complying with the Pension Board. See L.R. 56(a)(1) Stmt. ¶ 67; L.R. 56(a)(2) Stmt. ¶ 67; Gerlach Aff. ¶ 22.

On May 2, 2008, Gerlach submitted a letter applying for Retirement for Disability Incurred in the Line of Duty. See L.R. 56(a)(1) Stmt. ¶ 69; L.R. 56(a)(2) Stmt. ¶ 69. Gerlach's letter was not accompanied by a doctor's letter or any information regarding whether the injury was work related, whether Gerlach was able to perform his duties, or whether Gerlach had reached maximum medical improvement. See L.R. 56(a)(1) Stmt.

4

¶ 70; L.R. 56(a)(2) Stmt. ¶ 70.  On May 15, 2008, Charles Slagle, on behalf of the Pension Board, wrote to Gerlach, requested such information, and informed him that his request would be "tabled" until the information was received.  See L.R. 56(a)(1) Stmt. ¶ 71, L.R. 56(a)(2) Stmt. ¶ 71.  As of July 11, 2008, the Pension Board still had not received this information, even though they had written a second letter to Gerlach on June 23, 2008, reiterating the need for such information.  See L.R. 56(a)(1) Stmt. ¶¶ 72–73; L.R. 56(a)(2) Stmt. ¶¶ 72–73.

On July 11, 2008, Herald sent yet another letter to Gerlach stating that, if Gerlach failed to provide the requested information to the Pension Board by July 26, 2008, he would be placed on unpaid leave.  See L.R. 56(a)(1) Stmt. ¶ 74; L.R. 56(a)(2) Stmt. ¶ 74.[8]  Defendants assert that Gerlach failed to provide such information by this date; however, Gerlach asserts that he offered to provide letters from those individuals providing treatment or to provide Landino's report, but the Pension Board told him that type of documentation was unacceptable.  See L.R. 56(a)(1) Stmt. ¶ 75; L.R. 56(a)(2) Stmt. ¶ 75.  On July 26, 2008, Herald placed Gerlach on unpaid leave.  See L.R. 56(a)(1) Stmt. ¶ 76; L.R. 56(a)(2) Stmt. ¶ 76.

The Pension Board decided to use Landino's IME report to initiate consideration of Gerlach's application.  See L.R. 56(a)(1) Stmt. ¶ 79; L.R. 56(a)(2) Stmt. ¶ 79.  After receiving Landino's report, defendants assert that the Pension Board deferred to the CHC to arrange two IME's for Gerlach, and the CHC independently chose psychiatrists Walter A. Borden, MD and Mark Rubinstein, MD to conduct the IME's.  See L.R. 56(a)(1) Stmt. ¶¶ 80–81.  Gerlach, however, contends that these doctors were chosen in consultation with the Director of Human Resources, Virginia Alesco-Werner, and

_____

[8] See supra n. 3.

5

upon the recommendation of particular workers' compensation attorneys associated with CHC or the City.  See L.R. 56(a)(2) Stmt. ¶ 81.

Borden evaluated Gerlach and issued a report on or about October 29, 2008, indicating that Gerlach "ha[d] a permanent partial impairment/disability," but that "this impairment/disability [did not] occur (partially or totally) as a result of the Fire Fighter's job."  See L.R. 56(a)(1) Stmt. ¶¶ 83–84; L.R. 56(a)(2) Stmt. ¶¶ 83–84.  In contrast, Rubinstein indicated that Gerlach "ha[d] a permanent partial impairment/disability" and that "this impairment/disability occur[red] (partially or totally) as a result of the Fire Fighter's job."  See L.R. 56(a)(1) Stmt. ¶ 85; L.R. 56(a)(2) Stmt. ¶ 85.

After receiving both reports, the Pension Board held a special meeting to vote on Gerlach's application for a service connected disability pension.  See L.R. 56(a)(1) Stmt. ¶ 87; L.R. 56(a)(2) Stmt. ¶ 87.[9]  Gerlach did not attend the meeting.  L.R. 56(a)(1) Stmt. ¶ 88; L.R. 56(a)(2) Stmt. ¶ 88.[10]  At the November 19, 2008 meeting, the Pension Board denied Gerlach's application for a service connected disability pension and decided that if Gerlach applied for a non-service connected disability pension, it would be granted.  See L.R. 56(a)(1) Stmt. ¶¶ 90–91; L.R. 56(a)(2) Stmt. ¶¶ 90–91.

On November 26, 2008, a grievance ("Grievance 08-005") was filed on Gerlach's behalf arguing that the City and Fire Department had violated the CBA and pension agreement by failing to pay Gerlach "weekly wages, sick leave, injury leave or disability benefits."  See L.R. 56(a)(2) Stmt. ¶ 102.  The grievance was denied at Step One and Step Two of the Grievance Procedure.  See L.R. 56(a)(1) Stmt. ¶¶ 103, 106; L.R. 56(a)(2) Stmt. ¶¶ 103, 106.  The Union submitted the grievance to arbitration with the

---

[9] See supra n. 3.

[10] See supra n. 3.

6

State Board of Mediation and Arbitration (hereafter "SBMA") with regard to the unpaid leave issue only.  L.R. 56(a)(1) Stmt. ¶ 107; L.R. 56(a)(2) Stmt. ¶ 107.  Gerlach alleges that the City and Union worked out a settlement with regard to the grievance; however, when Gerlach refused to agree to the settlement, the Union refused to go forward with the hearing.  See L.R. 56(a)(2) Stmt. ¶¶ 108, 110.  Gerlach never filed a claim for breach of duty of fair representation against the Union for this grievance.  See L.R. 56(a)(1) Stmt. ¶ 111; L.R. 56(a)(2) Stmt. ¶ 111.

As of March 20, 2009, Gerlach had not applied for a non-service connected disability pension.  See L.R. 56(a)(1) Stmt. ¶ 93; L.R. 56(a)(2) Stmt. ¶ 93.  On March 20, 2009, Herald wrote another letter to Gerlach indicating that non-disciplinary termination was again being considered because Gerlach had failed to apply for a non-service connected disability pension.  See L.R. 56(a)(1) Stmt. ¶ 94; L.R. 56(a)(2) Stmt. ¶ 94.  On April 28, 2009, Gerlach's attorney wrote a letter to the Pension Board on Gerlach's behalf to "appl[y] for an in the line of duty disability, or, if the Pension Board denies that benefit, for a non-service related disability pension" and submitted several documents on his behalf.  See L.R. 56(a)(1) Stmt. ¶¶ 95, 97; L.R. 56(a)(2) Stmt. ¶¶ 95, 97.  On April 28, 2009, the Pension Board granted Gerlach a non-service connected disability pension.  See L.R. 56(a)(1) Stmt. ¶ 98; L.R. 56(a)(2) Stmt. ¶ 98.

On May 14, 2009, a grievance ("Grievance 09-002") was filed on Gerlach's behalf with regard to the City's decision not to pay Gerlach for five weeks of unused vacation time at the time of retirement.  See L.R. 56(a)(1) Stmt. ¶¶ 112–13; L.R. 56(a)(2) Stmt. ¶¶ 112–13.  The grievance was denied at Step One and Step Two of the grievance process.  See L.R. 56(a)(1) Stmt. ¶¶ 115–17; L.R. 56(a)(2) Stmt. ¶¶ 115–17.

7

The Union submitted this grievance to arbitration with the SBMA.  L.R. 56(a)(1) Stmt. ¶ 119; L.R. 56(a)(2) Stmt. ¶ 119.  Defendants assert that Gerlach refused to cooperate with the Union in arbitrating this grievance, and the Union subsequently withdrew the grievance.  See L.R. 56(a)(1) Stmt. ¶ 121.  Gerlach denies this assertion and contends that the Union failed to respond to the City and ultimately withdrew the grievance.  See L.R. 56(a)(2) Stmt. ¶ 120–21.  The parties agree that Gerlach never filed a claim for breach of duty of fair representation against the Union for withdrawing this grievance. See L.R. 56(a)(1) Stmt. ¶ 122; L.R. 56(a)(2) Stmt. ¶ 122.

## III.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d

255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine

issue' exists for summary judgment purposes where the evidence is such that a

reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau,

524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d

Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir.

2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a

non-moving party must point to more than a mere "scintilla" of evidence in order to

defeat a motion for summary judgment).

## IV.   DISCUSSION

Defendants first argue that neither the City nor the Pension Board can be held

liable for any actions taken by Herald with regard to Gerlach's pension because Herald

is not a final policymaker for pension purposes.[11]  Next, defendants assert that they are

entitled to summary judgment with regard to Gerlach's due process claim pursuant to 42

U.S.C. § 1983 because Gerlach does not have a protected property interest in a service

related disability pension and, even if he did, his due process rights were not violated.

Finally, defendants contend they are entitled to summary judgment with regard to

Gerlach's breach of contract claim because Gerlach failed to exhaust his administrative

remedies, and the City has not breached the CBA.

### A.   The City's Liability for Chief Herald's Actions

Section 1983 of the United States Code provides, in relevant part, "Every person

who, under color of any statute, ordinance, regulation, custom, or usage, of any State or

Territory . . . subjects, or causes to be subjected, any citizen of the United States . . . to

---

[11] For the purposes of this Motion, defendants do not contest that the Pension Board and its members are final policymakers for purposes of section 1983.  See Defs.' Mem. Supp. Summ. J. at 21.

the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."  While a municipality is considered a "person" pursuant to section 1983, a municipality may not be held liable under section 1983, under a theory of <u>respondeat superior</u>, simply because it employs a tortfeasor.  See <u>Bd. of the Cnty. Comm'rs of Bryan Cnty., Oklahoma v. Brown</u>, 520 U.S. 383, 403 (1997).  Typically, to impose liability upon a municipality, a plaintiff must demonstrate a municipal "policy" or "custom" that caused the plaintiff's injury.  See <u>id.</u>  A municipality may be liable for a single decision by a municipal policymaker, however, so long as the plaintiff demonstrates that the defendant had final policymaking power.  See <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 37 (2d Cir. 2008).  Courts look to state law to determine, as a matter of law, whether an official had final policymaking authority with respect to the challenged conduct.  See <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 123 (1988); <u>Jeffes v. Barnes</u>, 208 F.3d 49, 57 (2d Cir. 2000) ("The matter of whether the official is a final policymaker under state law is to be resolved by the trial judge <u>before</u> the case is submitted to the jury.") (internal quotation omitted) (emphasis in original).

Pursuant to Section 6-10 of the Danbury Charter, the Fire Chief:

> shall assign all members of the department to their respective posts, shifts, details and duties; shall make rules and regulations concerning the operation of the Department and the conduct of all officers and employees thereof; and shall be responsible for the efficiency, discipline and good conduct of the department and for the care and custody of all property used by the Department.

Further, the Chief may dismiss or take other disciplinary action against those who disobey the Chief's lawful orders, rules, and regulations.  See <u>id.</u>

Gerlach does not appear to contest the defendants' assertion that Herald does not sit on the Pension Board.  Rather, Gerlach asserts that Herald, acting as Fire Chief,

was closely involved in how the Pension Board handled Gerlach's pension application, as evidenced by Herald's repeated requests that Gerlach comply with the Pension Board's demands.  See Mem. Opp. Summ. J. at 22.   Specifically, Gerlach contends that the "interrelationship between Herald and the Pension Board" is sufficient to create a genuine issue of fact with regard to whether Herald, "the city's policy maker about firefighters," and the Pension Board, "the city's policy maker about pension awards[,] worked together to deprive [Gerlach] of his constitutional rights."  See Mem. Opp. Summ. J. at 23.

In support of his assertion, Gerlach points to Thomas v. City of West Haven, 249 Conn. 385 (1999), where the Connecticut Supreme Court held that, where an inference could be drawn that two non-voting members of a commission with final policymaking authority violated the plaintiff's constitutional rights, sufficient evidence existed to hold the municipality liable under section 1983.  See Thomas, 249 Conn. at 414.  Unlike in Thomas, however, Herald not only did not vote on Gerlach's pension application, but it appears undisputed that he was not a member of the Pension Board at all.  Further, based on the description of the Fire Chief's responsibilities as set forth in the Danbury Charter, it does not appear that Herald has any authority with regard to the Pension Board's decision on pension applications.  See Danbury Charter, Section 6-10. Consequently, Gerlach has failed to demonstrate that Herald was a final policymaker with regard to the conduct Gerlach challenges, namely the Pension Board's denial of his application for a service connected disability pension.  As a result, the City is not subject to liability pursuant to 42 U.S.C. § 1983 for Herald's actions.

B.    Due Process Claim

To prevail on his procedural due process claim, Gerlach must demonstrate the he possessed a protected property interest in the service connected disability pension, and that he was deprived of this interest without due process.  See McMenemy v. City of Rochester, 241 F.3d 279, 286 (2d Cir. 2001).  Defendants claim that they are entitled to summary judgment as to Gerlach's due process claim because Gerlach did not possess a property interest in a service connected disability pension.  Further, defendants argue that, even if Gerlach did have a property interest in such a pension, they are entitled to summary judgment because Gerlach was not deprived of due process.

1.    Property Interest

It is well-established that, to have a property interest in a benefit, an individual must "have a legitimate claim of entitlement to it."  See McMenemy, 241 F.3d at 286 (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)).  The Second Circuit has held that a property interest exists where eligible individuals are entitled to disability retirement benefits pursuant to the City Code.  See Basciano v. Herkimer, 605 F.2d 605, 609 (2d Cir. 1978).  In contrast, a property interest does not exist where retirement benefits are secured through a collective bargaining agreement, and plaintiffs claim that, though they have been receiving pension benefits, they are entitled to an increase in those benefits.  See Costello v. Town of Fairfield, 811 F.2d 782, 784 (2d Cir. 1987).  In Costello, the Second Circuit noted that "[In Basciano], the plaintiff alleged that the City's procedure to determine whether he was entitled to any disability retirement benefits . . . deprived him of due process.  Unlike in Basciano, appellants here have not been denied

their basic retirement benefits.  Appellants have been receiving their pensions and merely dispute the lack of an increase they claim is due them under the collective bargaining agreement."  See id. (emphasis in original).  The Second Circuit has not specifically addressed whether a property interest exists as to a particular level of pension benefits.

Defendants assert that Gerlach's interest in a service connected disability pension is not a property interest because, unlike in Basciano, Gerlach was not denied retirement benefits entirely.  See Mem. Supp. Summ. J. at 24.  Defendants argue that, while Gerlach has a property interest in some type of a pension, he does not have a property interest in a particular type of pension.  See id.  In response, Gerlach contends that Basciano is controlling because the requirements for obtaining a service connected disability pension are set forth in Section 14-32 of the City Ordinances, not the CBA, as was the case in Costello.  See Mem. Opp. Summ. J. at 27.

The court recognizes that, similar to Basciano, the qualifications for receiving a service connected disability pension are set forth in Section 14-32 of the City Ordinances, which provides:

> When such regular member of said fire department shall become permanently disabled so as to be unable to perform active service in the Danbury Fire Department by reason of mental or physical disability resulting from injury received or exposure endured in the performance of his duty, he may make application for retirement to the [Pension Board] and said [Board] shall retire such employee on an annual pension . . . provided such member has been examined by two (2) physicians and he has been found by such physicians to be unable to perform active service in said department.

Danbury Code of Ordinances, Ch. 14, § 14-32.  Pursuant to Section 14-34,

13

In all cases where physicians are required for examination of members for retirement, they shall be designated by the board of directors.  Such physicians as said board of directors may designate shall certify in writing that such disability exists and, in their opinion, the cause thereof.

However, similar to Costello, the Pension Board did not deny Gerlach all pension benefits, but rather denied him a particular level of benefits to which Gerlach, similar to the appellants in Costello, believes he is entitled.  On the basis of these facts, and because the court can resolve this Motion without reaching this issue, the court will assume, without deciding, that Gerlach has raised a material issue of fact with regard to whether he has a property interest in a service connected disability pension.

          2.     Due Process

Defendants next argue that, even if Gerlach did have a valid property interest, his due process rights were not violated because the Pension Board gave Gerlach appropriate notice and opportunity to be heard, and any additional process was unnecessary and would have been futile.  See Mem. Supp. Summ. J. at 25–27; Reply at 3–6.  In response, Gerlach asserts that his due process rights were violated because the defendants "engineered proceedings to achieve a specific result," in that Gerlach's application was treated differently than previous firefighters' applications had been treated, and one of the IME physicians, Dr. Borden, provided a biased opinion.  See Mem. Opp. Summ. J. at 28–31.

In determining whether a procedure satisfies due process, a court must consider: "(1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; and (3) the government's interest, including the possible burdens of alternative procedures.  See O'Connor v. Pierson, 426 F.3d 187, 197 (2d Cir. 2005).  Pre-

deprivation procedures are also evaluated in terms of the due process principle "mandating that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  See id. (internal quotations omitted).  While due process requires an opportunity "to present argument and evidence" in support of an individual's position, it does not require an in-person hearing.  See Basciano, 605 F.2d at 611 (holding that "trial-type proceeding" is unnecessary and "would not enhance significantly the accuracy of a disability determination"); Calzerano v. Bd. of Trs. of Police Pension Fund, 877 F. Supp. 161, 164 (E.D.N.Y. 1995).  Where an individual received constitutionally adequate notice and opportunity to be heard, additional process is not required where such process would be futile.  See O'Connor, 426 F.3d at 198.

It is undisputed that, following his initial letter application to the Pension Board on May 2, 2008, Gerlach received several letters from various individuals requesting that Gerlach provide the Pension Board with information regarding the nature of his injury, whether the injury was work related, whether Gerlach had reached maximum medical improvement, and whether Gerlach was unable to perform his duties.  See L.R. 56(a)(1) Stmt. ¶¶ 70–74; L.R. 56(a)(2) Stmt. ¶¶ 70–74.  The Board then used this information to initiate the IME doctors' consideration of Gerlach's application.  L.R. 56(a)(1) Stmt. ¶ 79; L.R. 56(a)(2) Stmt. ¶ 79.  In addition, prior to acting on Gerlach's application, the Pension Board obtained two IME reports, as required by Section 14-32.  The various letters to Gerlach, the IME doctors' consideration of the information submitted by Gerlach, and the Board's consideration of the IME reports was constitutionally sufficient

to provide Gerlach with notice and an opportunity to be heard.[12]  See Calzerano, 877 F. Supp. at 164 ("Due Process requires only an opportunity to be heard, that is, to present argument and evidence which support the applicant's position to the Board or person making the determination.").

Gerlach first argues that due process was insufficient because Gerlach's application was treated differently than applications submitted by other firefighters who were awarded service connected disability pensions.  See Mem. Opp. Summ. J. at 28–29.  Such a complaint is properly addressed through a claim pursuant to the Equal Protection Clause rather than the Due Process Clause.  See Ross v. Moffitt, 417 U.S. 600, 609 (1974) ("'Due process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated.  'Equal protection,' on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable.").  As Gerlach has not pled an equal protection claim, the court will not address the merits of this argument.  It is clear, however, that this assertion does not raise a material issue of fact as to whether Gerlach was denied procedural due process.[13]

Next, Gerlach asserts that one of the doctors who completed an IME report, Dr. Borden, failed to offer an objective opinion.  See Mem. Opp. Summ. J. at 28–29.  First, Gerlach argues that sufficient evidence exists for a jury to draw an inference that

---

[12] Gerlach argues that, because he was only notified of the Board's meeting on the morning of the meeting, he was denied a meaningful opportunity to be heard.  See Sur-reply at 5.  It is well-established, however, that due process does not guarantee an opportunity to be heard in person.  See Basciano, 605 F.2d at 611.

[13] Further, so long as the minimal due process requirements of notice and opportunity to be heard have been met, an assertion that the Board varied from past practices will not sustain a claim for a procedural due process violation.  See McDarby v. Dinkins, 907 F.2d 1334, 1338 (2d Cir. 1990).

Borden was "specially selected in order to provide a basis" to deny Gerlach's application.  See Sur-reply at 5.  In support of this assertion, Gerlach points to five emails between a CHC employee and Virginia Alosco-Werner, the City's Director of Personnel.  See Maurer Aff. Ex. HH.  Borden's name, however, is not mentioned in any of these emails.  See id.  Further, Alosco-Werner's only contribution to the communications is to ask whether Gerlach's appointments have been set up, and to alert the CHC to a letter being sent to Gerlach.  See id.  On the basis of this evidence, it would not be reasonable for a jury to infer that either the City or the Board "specially selected" Borden in order to deny Gerlach's application.  Consequently, this evidence fails to raise a material issue of fact in support of Gerlach's claims.

In addition, Gerlach contends that Borden is "a well known Freudian analyst," believes that "depression always originates in childhood trauma" and, as a result "is unable, within his training, to attribute depression to job related occurrences."  See L.R. 56(a)(2) Stmt. ¶ 83.  In support of these assertions, Gerlach attaches several cases from various jurisdictions in which Borden has testified.[14]  See Maurer Aff. Ex. TT.  First, the court has serious doubts as to whether such evidence is admissible to support these propositions.  See Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) (noting that, while courts may take judicial notice of documents filed in other courts to establish the fact of such litigation and related filings, such evidence is not considered for "the truth of the matters asserted in other litigation."); see also ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir. 2007) (stating that "conclusory statements, conjecture,

_____

[14]   Plaintiff fails to provide a citation to a specific page which he contends supports this assertion.  See L.R. 56(a)(2) ¶ 83.  After review of the entire exhibit, the court notes that at least one of the opinions speaks favorably of Dr. Borden, noting that he is a "qualified psychiatrist[]" and provided the "most thorough, objective and logical" theory in the case.  See Ex. TT at 8.  Further, none of these opinions characterizes Borden as a "Freudian analyst."

and inadmissible evidence are insufficient to defeat summary judgment").  More

importantly, however, such assertions are belied by Borden's actual report, which

spends minimal effort discussing Gerlach's childhood, and instead, specifically notes

that "the more recent proximal cause of Mr. Gerlach's depression is two failed

marriages."  See Mot. Summ. J., Ex. 32.  Gerlach's reliance on Ex. TT is insufficient to

raise a material issue of fact to support Gerlach's argument that he was denied

procedural due process due to an inherently biased IME report.  As Gerlach fails to

raise a material issue of fact in support of his due process claim, summary judgment is

warranted in favor of the defendants.

      C.    <u>Breach of Contract</u>

      With regard to Gerlach's breach of contract claim, defendants first argue that this

court lacks subject matter jurisdiction because Gerlach has failed to exhaust his

administrative remedies.  See Mem. Supp. Summ. J. at 27–28.  Alternatively,

defendants argue that the City did not breach the CBA.  See id. at 32–34.  Gerlach does

not appear to argue that he has exhausted his administrative remedies.  See Mem.

Opp. Summ. J. at 36–37.  Instead, Gerlach argues that he should not be required to do

so because further administrative remedies would have been futile, and that material

issues of fact exist as to whether defendants breached the CBA.  See id. at 33–40.

      Specifically, Gerlach asserts that the City breached the CBA by disciplining

Gerlach without just cause by placing Gerlach on unpaid leave, improperly ordering

IMEs to be performed, failing to allow Gerlach to exhaust an entire year of sick leave,

and failing to pay Gerlach for unused vacation time to which he asserts he is entitled.

See Mem. Opp. Summ. J. at 37–40.  Article Six of the CBA sets forth a three-step

process under which an employee who feels aggrieved regarding his "wages, hours, or conditions of employment" may pursue a remedy.  At the first step, an employee may submit a written grievance to the Fire Chief, who must hold a meeting with Union representatives within five days to adjust or resolve the grievance.  See CBA Art. 6, § 1(A).  If the grievance is not sufficiently resolved, the Union may present the grievance, in writing, to the Mayor.  See id. § 1(B).  Within seven days, the Mayor or his designee must meet with Union representatives to adjust or resolve the grievance.  See id.  If the grievance is still not resolved, within ten days, the Union may submit the dispute to arbitration by the Connecticut State Board of Mediation and Arbitration ("SBMA"), whose decision shall be final and binding on all parties.  See id. § 1(C).  The CBA specifies that the Union "shall be the exclusive representative for filing for arbitration."  Id. Art. 6 § 1.

"It is well settled under both federal and state law that, before resort to the courts is allowed, an employee must at least attempt to exhaust exclusive grievance and arbitration procedures, such as those contained in the collective bargaining agreement between the defendant and the plaintiffs' union . . . .  Failure to exhaust the grievance procedures deprives the court of subject matter jurisdiction."  Saccardi v. Bd. of Educ. of the City of Stamford, 45 Conn. App. 712, 715–16 (Conn. App. Ct. 1997) (quoting Hunt v. Prior, 236 Conn. 421, 431–32 (1996)).  Where a CBA specifies that the Union shall be the exclusive representative to bring a grievance to arbitration, an employee has no further remedy unless the employee can demonstrate that the Union breached its duty of fair representation by acting arbitrarily, maliciously, or in bad faith.  See Saccardi, 45 Conn. App. at 722.  An employee must bring such a claim against the Union before the board of labor relations prior to seeking judicial review from the courts.  See Piteau v.

<u>Bd. of Educ. of City of Hartford</u>, 300 Conn. 667, 683 (2011);[15] <u>Berg v. City of Stamford</u>, 2011 WL 7064470, at *6–7 (Conn. Super. Dec. 19, 2011).

Gerlach admits that he never filed a grievance regarding to Herald's decision to send Gerlach for an IME in March 2008.  L.R. 56(a)(1) Stmt. ¶ 58; L.R. 56(a)(2) Stmt. ¶ 58.  As to the two grievances Gerlach did file, Grievance 08-005 and Grievance 09-002, Gerlach raised both grievances to Step Three of the grievance procedure; however, neither grievance was actually submitted to the SBMA for arbitration.  <u>See</u> L.R. 56(a)(2) Stmt. ¶¶ 108, 110, 120–21.  Gerlach alleges that neither grievance reached arbitration because the Union abandoned him; however, he admits that he never filed a claim against the Union for breach of the duty of fair representation with regard to either grievance.  L.R. 56(a)(1) Stmt. ¶¶ 111, 122; L.R. 56(a)(2) Stmt. ¶¶ 111, 122.  As a result, Gerlach has failed to exhaust his administrative remedies.

Gerlach contends, however, that he should not be required to exhaust his administrative remedies, because to do so would have been futile.[16]  A limited exception to the general rule of exhaustion exists where recourse to the administrative remedy would be futile or inadequate, in that such action "<u>could</u> <u>not</u> result in a favorable decision and <u>invariably</u> would result in further judicial proceedings."  <u>See</u> <u>Neiman v. Yale Univ.</u>, 270 Conn. 244, 258–59 (2004) (emphasis in original) (internal quotations

---

[15] Plaintiff contends that <u>Piteau</u> is only applicable to "hybrid" cases, where a plaintiff brings a claim for breach of duty of fair representation against the Union, as well as a breach of contract claim against the employer.  <u>See</u> <u>Mem. Opp. Summ. J.</u> at 36.  The court in <u>Piteau</u>, however, did not limit its decision to such hybrid claims.  <u>See</u> <u>Piteau</u>, 300 Conn. at 683 ("An employee alleging a breach of the duty of fair representation . . . initially must seek relief before the board of labor relations, and jurisdiction lies in the Superior Court only for purpose of an appeal from an adverse final order of the board of labor relations.").

[16] To the extent Gerlach's Supplemental Memorandum raises an argument that public employees are not required to exhaust their administrative remedies when pursuing a statutory claim, <u>see</u> Doc. No. 132 at 2 n. 2, the court notes that Gerlach's Amended Complaint raises a breach of contract claim, not a statutory claim.

omitted).  This exception is to be applied infrequently, and only for narrowly defined

purposes.  See id.  Courts have found that utilizing administrative procedures is not

futile even where the decision maker has indicated that it will rule against the grievant,

or where the likelihood of an adverse decision exists, so long as the possibility exists

that the grievance procedures may provide the plaintiff with the desired relief.  See id. at

259–60; Labbe v. Pension Comm'n of the City of Hartford, 229 Conn. 801, 813 (1994).

Gerlach argues that exhaustion was futile because "there could be no question

that Herald was going to deny any grievance he presented and the city would back

Herald."  Mem. Opp. Summ. J. at 36.  In support of this assertion, Gerlach points to

several of the City's answers to various allegations in Gerlach's Complaint.  See id. at

33–34.  Such answers, however, are not sufficient to demonstrate that it would have

been futile for Gerlach to exhaust his administrative remedies.  First, with regard to the

Herald's order to submit to the IME, it cannot be said that the grievance procedure

necessarily could not have resulted in a favorable decision, especially given that the

third step in the procedure calls for arbitration by the SBMA, a neutral party.  See

Saccardi, 45 Conn. App. at 721 ("One can only speculate as to whether arbitration here

would have resulted in a decision unfavorable to the plaintiff.  We certainly cannot say

that he could not obtain a favorable decision.").   Similarly, as to the grievances which

Gerlach filed, it is clear that the Board of Labor Relations was capable of rendering a

decision in Gerlach's favor, had Gerlach pursued a claim that the Union had violated its

duty of fair representation by abandoning him at the arbitration stage, in violation of

section 7-468(d) of the Connecticut General Statutes.  See Conn. Gen. Stat. § 7-

471(5)(B) ("If . . . the board determines that a [practice prohibited by sections 7-467 to

7-477, inclusive] has been or is being committed, it shall state its findings of fact and shall issue and cause to be served on the party committing the prohibited practice an order requiring it or him to cease and desist from such prohibited practice, and shall take such further affirmative action as will effectuate the policies of sections 7-467 to 7-477."). Consequently, it would not have been futile for Gerlach to exhaust his administrative remedies. As a result, this court lacks subject matter jurisdiction over Gerlach's breach of contract claims, and summary judgment is warranted.

## V.    CONCLUSION

For the reasons set forth above, defendants' Motion for Summary Judgment (Doc. No. 89) is **granted**. Defendants' Motion for Leave to File Excess Pages (Doc. No. 122) is **granted**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 27th day of March, 2012.

　/s/ Janet C. Hall 　 　
Janet C. Hall
United States District Judge